UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KAREN JANTZ,

                                Plaintiff,                          10 Civ. 6076 (PKC)

                -against-
                                                                   MEMORANDUM
                                                                   AND ORDER

EMBLEM HEALTH,

                                Defendant.
------------------------------------------------------------x
P. KEVIN CASTEL, District Judge:

             Plaintiff Karen Jantz brings this suit for employment discrimination under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights

Act of 1991 ("Title VII").  Plaintiff claims that defendant EmblemHealth Services Company,

LLC ("EmblemHealth") discriminated against her on the basis of her sexual orientation and

gender.  Discovery in this case is complete, and the defendant has moved for summary judgment

pursuant to Rule 56, FED. R. CIV. P.  For the reasons set forth below, the defendant's motion is

granted.

                                          BACKGROUND

             The following facts are either not disputed by plaintiff or, where there is a dispute,

plaintiff's evidence is accepted as true and all reasonable inferences are drawn in her favor as

non-movant.  See, e.g., Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

             Plaintiff is a lesbian.  (Compl. ¶ 7; Schmidt Decl. Ex. 6 ("Pl.'s Dep.") at 8.)

Plaintiff began working for EmblemHealth in 1998 as a Manager of the Medical Management

Call Center.  Plaintiff's domestic partner, Toni-Ann Coyne, also worked for EmblemHealth as a

nurse beginning in or around 2000.  (Plaintiff's Rule 56.1 Counter Statement of Facts ("Pl.'s

56.1 Resp.") ¶ 4; Pl.'s Dep. at 62.)[1]  Other employees became aware of plaintiff's sexual orientation and relationship with Coyne in 2002 or 2003.  (Compl. ¶ 10; Ricotta Decl. Ex. 1 ("Pl.'s Dep.") at 9.)

> I.    Plaintiff's Allegations and Written Complaints of Discrimination

Beginning in 2003 or 2004, plaintiff allegedly began to suffer harassment and discriminatory treatment from two EmblemHealth employees, Dr. Dennis Liotta and Dr. Mark Cukierman.  (Pl.'s Dep. at 78; Compl. ¶¶ 10, 12–15.)  Dr. Liotta was the direct supervisor of Coyne, plaintiff's domestic partner.  (Pl.'s Dep. at 63.)  According to plaintiff, Dr. Liotta approached plaintiff's direct supervisor, Dr. Claudia Hanson, sometime in 2005 detailing a "laundry list" of issues he had with plaintiff and seeking to have plaintiff terminated "solely because of [her] relationship with" Coyne.  (Id.)[2]  Although plaintiff had previously reported to Dr. Liotta at some point in the "early 2000s," Dr. Liotta retained no supervisory authority over plaintiff or plaintiff's supervisor, Dr. Hanson.  (Pl.'s 56.1 Resp. ¶ 5; Schmidt Decl. Ex. 12 ("Hanson Dep.") at 29–30.)  Plaintiff also never reported to Dr. Cukierman at any point during her employment.  (Pl.'s Dep. at 26–27.)

Plaintiff first notified EmblemHealth of discriminatory treatment in a meeting with Dr. Hanson in March 2005.  In the meeting, Dr. Hanson told plaintiff that another employee, Dr. Ronald Platt, had accused plaintiff of "speaking poorly" of Dr. Liotta and Dr. Cukierman.  (Pl.'s Dep. at 98.)  Thereafter, plaintiff submitted a written complaint to Valerie Reardon, the Senior Vice President of Corporate Compliance, on April 20, 2005.  (Ricotta Decl. Ex. 4; Pl.'s Dep. at 98.)  In her letter to Reardon, plaintiff alleged that Dr. Platt's accusation

---

[1] Plaintiff's domestic partner has since reverted to her maiden name, Toni-Ann Devito.  (Pl.'s Dep. at 62.)
[2] Dr. Hanson recalled a conversation in which Dr. Liotta did not "speak[] very highly of" plaintiff, but did not recall him suggesting plaintiff's employment be terminated.  (Hanson Dep. at 29–33, 60.)  For purposes of this motion, I accept plaintiff's version as true.

coupled with "unscrupulous behavior" by Dr. Liotta and Dr. Cukierman were the result of her "being singled out because of [her] sexual orientation and the current employment issues surrounding [her] domestic partner Ms. Toni-Ann Coyne."  (Ricotta Decl. Ex. 4 at 24–25.) EmblemHealth responded in May 2005 with a written letter promising to investigate plaintiff's allegations.  (Pl.'s Dep. at 126–27.)

Plaintiff subsequently wrote at least five additional letters to EmblemHealth concerning discriminatory treatment she allegedly suffered in 2005 and 2006.  In a May 19, 2005 letter to Michael Fullwood, Chief Financial Officer and General Counsel, plaintiff again complained of being "harassed, intimidated, [and] retaliated against because of [her] sexual orientation" and because of "issues surrounding" her relationship with Coyne, plaintiff's domestic partner.  (Ricotta Decl. Ex. 5.)  Plaintiff further detailed Dr. Liotta and Dr. Cukierman's "retaliatory efforts" in "walking past [her] office door staring at [plaintiff], passing sarcastic comments at meetings, attempting to exclude [plaintiff] from meetings . . . , and by continuing to present issues to [her] superiors that are simply not true . . . .  because of [plaintiff's] sexuality."  (Id. at 31.)  Plaintiff wrote another letter to Fullwood dated June 15, 2005 in which she detailed the "continued efforts by Dr. Dennis Liotta and Dr. Mark Cukierman to harass, retaliate, and discriminate against" her.  (Id. Ex. 6 at 32.)  Nowhere in either letter did plaintiff allege mistreatment on any basis other than her sexual orientation.

EmblemHealth investigated plaintiff's complaints.  (Pl.'s Dep. at 155.)  The investigation, which included interviews of other EmblemHealth employees, found no evidence of discrimination based on plaintiff's sexual orientation or that plaintiff was being "retaliated against."  (Id.)  Plaintiff submitted another letter in November 2005 complaining that Dr. Platt retaliated against her by not inviting her to his retirement party.  (Id. at 158–60.)  Plaintiff

testified as to having "no idea" why she wasn't invited but that she "assumed" it was attributable to her sexual orientation, gender, or "retaliatory" efforts by Dr. Platt.  (Id. at 144, 158–60.)

Plaintiff did not complain to EmblemHealth of any further discriminatory or retaliatory acts until July 2006.  (Pl.'s 56.1 Resp. ¶ 20.)  In a letter to Fullwood dated July 25, 2006, plaintiff expressed frustration at the findings of EmblemHealth's investigation into her previous complaints.  (Ricotta Decl. Ex. 7 at 35.)  Specifically, plaintiff accused EmblemHealth of "misconstru[ing]" the dates in which Dr. Liotta spoke with Dr. Hanson in an effort to "rationalize Dr. Liotta's retaliatory actions."  (Id. at 37.)  Plaintiff reiterated that Dr. Liotta sought to have her fired "solely because of [her] relationship with Ms. Coyne."  (Id. at 36.)  To this letter, plaintiff received a written response dated July 27, 2006 from Assistant General Counsel Joan Ruby in which Ruby confirmed that the investigation uncovered no evidence that Dr. Liotta sought to have plaintiff terminated in June 2005 or that Dr. Hanson would "be influenced by such a statement."  (Id. Ex. 8 at 38.)

In her final written complaint, dated July 28, 2006, plaintiff again expressed dissatisfaction with "the way [her] situation was be[ing] handed by" defendant's legal department.  Plaintiff recounted a July 18, 2006 meeting wherein Dr. Hanson, in the presence of other EmblemHealth employees, reported that members of the legal department had openly discussed the investigation into plaintiff's allegations.  (Id. Ex. 9 at 39.)  Plaintiff cited the meeting as an example of the "inappropriate" and "unprofessional" way defendant was handling its investigation into her complaints.  (Id.)

In addition to the allegations contained in her written complaints, plaintiff also alleges that at some point during her employment, Dr. Liotta retaliated by disinviting her from a meeting concerning the company's E-Time System, an electronic tool used to monitor employee

4

hours.  (Id. at 31–36.)  Dr. Liotta and Dr. Cukierman also allegedly made it a habit to "walk by" plaintiff's office and "leer or stare" at her.  (Id. at 45.)  And on two occasions, Dr. Cukierman made "gender specific" comments that offended plaintiff.  In one instance, he "insinuated" that plaintiff engage in oral sex with him, while another time he "stopped [plaintiff] on the street one day" and discussed "his bowel habits."  (Id. at 50–51.)[3]  Plaintiff could not recall the exact year when either comment was made.  (Id. at 51.)

       II.       <u>Plaintiff's Salary Increases and Yearly Performance Reviews</u>

       Throughout this period, EmblemHealth provided to plaintiff yearly performance evaluations and salary increases commensurate with performance.  (See, e.g., Schmidt Decl. Exs. 7, 13, 14; Pl.'s Dep. at 82.)  In December 2003, plaintiff received the highest possible evaluation rating and a salary increase for the work she performed in calendar year 2003.  (Pl.'s 56.1 Resp. ¶¶ 11, 13.)  Dr. Liotta had no involvement with plaintiff's 2003 performance evaluation.  (Id. ¶ 14.)

       Despite the allegedly discriminatory and retaliatory conduct of Dr. Liotta and Dr. Cukierman, EmblemHealth continued to provide plaintiff with positive reviews and salary increases.  In November 2004, plaintiff was promoted to Administrative Director in the Case Management Department and received a raise in salary from $73,475 to $80,800.  (Id. ¶ 15.) Less than a month later, plaintiff received another raise, increasing her yearly salary to $83,625. (Schmidt Decl. Ex. 10; Pl.'s 56.1 Resp. ¶ 15.)  For the calendar year 2005, plaintiff received another raise and a grade of "Above Average."  Plaintiff alleges that although her department began using a new curve system for its employees beginning that year, the fact that she was not graded as "significantly above average" as in her prior reviews was the result of retaliation by

_____

[3] At deposition, plaintiff elaborated on Dr. Cukierman's insinuation of oral sex as follows: "He didn't say it.  He insinuated.  He had money in his hand and I said it is payday.  He said for what, took a tissue and wiped the side of his mouth and said oh, yeah."  (Id. at 51.)

Dr. Platt.  (Pl.'s Dep. at 169–80.)  Plaintiff does not dispute that Dr. Platt authorized plaintiff's

2004 promotion and her three salary increases from 2003 through 2005.  (Id. at 87–88, 123, 125.)

        Plaintiff again received the highest possible rating in her annual reviews for years

2006 and 2007, resulting in salary increases of 5% and 7%, respectively.  (Pl.'s 56.1 Resp. ¶¶

28–29, 32.)  Plaintiff had since begun reporting to Gail Nachbaur after her previous supervisor,

Dr. Hanson, left EmblemHealth earlier in 2006.  (Id. ¶ 26.)  As with Dr. Hanson, Dr. Liotta had

no supervisory authority over Nachbaur.  (Nachbaur Dep. at 34, 40.)  Neither Dr. Liotta nor Dr.

Platt were involved in preparing plaintiff's 2006 or 2007 annual performance evaluations, nor

did Dr. Liotta attempt to influence plaintiff's annual performance evaluations from 2005 through

2007.  (Pl.'s Dep. at 222–23, 240–42.)

    III.    <u>EmblemHealth's 2006 Merger and Plaintiff's Eventual Termination</u>

        In November 2006, EmblemHealth merged with another company.  (Pl.'s 56.1

Resp. ¶ 27.)  As a result, EmblemHealth began restructuring its business, including a substitution

of its medical management data system.  (Id. ¶ 37; Pl.'s Dep. at 250.)  Plaintiff alleges that

during the implementation of and training on the new "LandaCorp" system, Dr. Liotta "left

[plaintiff] out of" several meetings.  (Pl.'s Dep. at 29–30, 229–32.)  Plaintiff ultimately testified

to attending at least two meetings during the preliminary implementation and training on the

LandaCorp system.  (Id. at 236.)

        Plaintiff was terminated in October 2008.  (Id. at 55–56.)  Plaintiff was informed

that her position was being eliminated as a part of a company-wide reduction in force ("RIF")

pursuant to the merger.  (Pl.'s 56.1 Resp. ¶ 51.)  The RIF resulted in the termination of

approximately 59 other employees in addition to plaintiff.  (Storniolo Decl. ¶¶ 4, 8.)  Anthony

Storniolo, EmblemHealth's Director of Healthcare Operations, attested that Dr. Liotta "was not

involved in any way" in EmblemHealth's decision to implement a reduction in force or to eliminate plaintiff's position.  (Id. ¶¶ 6–7.)  Plaintiff testified to having no personal knowledge of which employees were responsible for eliminating her position or whether Dr. Liotta was involved in the decision-making process.  (Pl.'s Dep. at 58–59, 266; Pl.'s 56.1 Resp. ¶ 56.)

There is no dispute that Dr. Liotta "never had any impact on" Dr. Hanson's supervision of plaintiff nor had any supervisory authority over Nachbaur during the time she supervised plaintiff from 2006 through her 2008 termination.  (Pl.'s 56.1 Resp. ¶¶ 24, 43.)  The parties also agree that Dr. Liotta never impacted or influenced Nachbaur's supervision of plaintiff from 2006 until plaintiff's 2008 termination.  (Id. ¶ 45.)  Immediately prior to her termination, plaintiff had received a paid leave of absence and, upon returning, permission to work fewer hours while maintaining her full salary and job title.  (Schmidt Decl. Ex. 15; Pl.'s Dep. at 252, 259–64.)[4]  Plaintiff secured full-time employment with another healthcare company on February 15, 2009.  (Pl.'s Dep. at 293.)  The position plaintiff held upon termination, Administrative Director of Case Management, has not been filled and no longer exists at EmblemHealth.  (Storniolo Decl. ¶ 10; Nachbaur Dep. at 20.)  Coyne, plaintiff's domestic partner of thirteen years, is still employed by EmblemHealth.  (Pl.'s Dep. at 62–63.)

PROCEDURAL HISTORY

Plaintiff filed a verified complaint with the New York State Division of Human Rights ("NYSDHR") on January 6, 2009, alleging unlawful discrimination "because of sexual orientation and retaliation."  (Pl.'s 56.1 Resp. ¶¶ 59, 60; Schmidt Decl. Ex. 3.)  On April 16, 2010, the NYSDHR issued a determination finding no probable cause to believe plaintiff suffered sexual orientation discrimination or retaliation for opposing such discrimination.  (Schmidt Decl. Ex. 4 at 1.)  Plaintiff thereafter received a right-to-sue letter from the United

---

[4] Plaintiff had received a raise in July 2008, increasing her yearly salary to $94,525.  (Pl.'s Dep. at 262.)

States Equal Employment Opportunity Commission ("EEOC").  (Id. at 4.)  Plaintiff proceeded to file the present action under Title VII, alleging discrimination because of her "gender and/or sexual orientation."  (Compl. ¶¶ 1, 12–14.)

SUMMARY JUDGMENT STANDARD

EmblemHealth moves for summary judgment seeking dismissal of plaintiff's Complaint.  (Docket # 15.)  Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), FED. R. CIV. P.  It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief.  The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  This Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the non-moving party.  Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–88 (1986).  In reviewing a motion for summary judgment, the Court may scrutinize the record and grant or deny summary judgment as the record warrants.  Rule 56(c), FED. R. CIV. P.  In the absence of any disputed material fact, summary judgment is appropriate.  See id.

In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis

8

v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  On the other hand, a non-movant may not defeat an "otherwise properly support motion for summary judgment" by raising a dispute regarding "immaterial or minor facts." Powell, 364 F.3d at 84.  An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

The non-moving party does not show the existence of a genuine issue of fact "merely by making assertions that are conclusory or based on speculation."  Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008); see also Anderson, 477 U.S. at 249–50 (noting that summary judgment may be granted if the evidence is "merely colorable" or "not significantly probative" (internal citations omitted)).  Rather, the opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (internal quotations omitted).

Local Civil Rule 56.1 of this District requires a summary judgment movant to submit a statement with numbered paragraphs setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(a).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c).  "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement

of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Local Civil Rule 56.1(d). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Rule 56(c), FED. R. CIV. P.  "'Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'"  <u>Presbyterian Church of Sudan v. Talisman Energy, Inc.</u>, 582 F.3d 244, 264 (2d Cir. 2009) (quoting <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997)).

      Although discrimination claims typically involve questions of intent that are ill-suited to resolution at the summary judgment stage, the Second Circuit has gone "out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'"  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (quoting <u>McLee v. Chrysler Corp.</u>, 38 F.3d 67, 68 (2d Cir. 1994)), <u>cert. denied</u>, 540 U.S. 811 (2003).  "[T]rial courts should not treat discrimination differently from other ultimate questions of fact."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000) (internal quotations omitted).  Accordingly, "even in the discrimination context," a plaintiff must offer "more than conclusory allegations" to survive a motion for summary judgment.  <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 101 (2d Cir. 2010).

<u>DISCUSSION</u>

      Plaintiff's Complaint contains one claim of relief under Title VII in which she alleges that EmblemHealth subjected her to "adverse employment actions, a hostile work environment, and/or an atmosphere of adverse employment actions by the Defendants in retaliation for her complaints of discrimination."  (Compl. ¶ 48.)  Plaintiff claims that

EmblemHealth engaged in such acts on the basis of her "gender and/or sexual orientation." (Id. ¶¶ 12–14.)

        I.        Summary Judgment Is Granted as to Plaintiff's Claims of Discrimination Based on Sexual Orientation

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). McDonell Douglas v. Green, 411 U.S. 792 (1973), articulates a three-step framework for analyzing discrimination claims brought under Title VII. Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802–03. To make out a prima facie case, a plaintiff must show that: (1) he was a member of a protected class; (2) he was qualified for the position he held; (3) he experienced an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. Feingold, 366 F.3d at 152. The plaintiff's burden in establishing a prima facie case is "not a heavy one." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000); see also Woodman v. WWOR–TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (describing initial burden as "minimal" and "de minimus"). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory basis for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). Assuming the defendant meets its burden, the burden shifts back to the plaintiff to prove that the reasons proffered by the defendant were merely pretextual. See Isaac v. City of N.Y., 701 F. Supp. 2d 477, 486 (S.D.N.Y. 2010) (citing Burdine, 450 U.S. at 253).

Plaintiff has failed to establish a prima facie case of an adverse employment action or hostile work environment based on her sexual orientation.  "Title VII does not prohibit harassment or discrimination because of sexual orientation."  Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000).  Indeed, "[t]he law is well-settled in this circuit and in all others to have reached the question that" Title VII does not prohibit sexual orientation discrimination.  Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (quoting Simonton, 232 F.3d at 35).  As such, a plaintiff alleging sexual orientation discrimination "cannot satisfy the first element of a prima facie case . . . because the statute does not recognize homosexuals as a protected class." Id. at 217–18 (affirming summary judgment for employer on Title VII sexual orientation claim).

Plaintiff's Complaint does not allege a claim for relief under any federal statute other than Title VII, and does not allege a claim for relief under state law.  (Compl.; Pl.'s 56.1 Resp. ¶ 65.)  Accordingly, plaintiff's claim that defendant subjected her to "adverse employment actions, a hostile work environment, and/or an atmosphere of adverse employment actions" on the basis of her sexual orientation is dismissed for failing to state a claim.  Kiley v. Am. Soc'y for Prevention of Cruelty to Animals, 296 Fed. Appx. 107, 109 (2d Cir. 2008), cert. denied, 130 S. Ct. 379 (2009) (affirming Rule 12(b)(6) dismissal of Title VII sexual orientation claim because "[s]exual orientation is not included in the statutory protected class") (non-precedential).

II.     Summary Judgment Is Granted as to Plaintiff's Claim of Discrimination Based on Gender and/or Failure to Conform to Gender Stereotypes

Plaintiff alleges that EmblemHealth discriminated against her because of her "gender and/or sexual orientation."  (Compl. ¶¶ 12, 14.)  In her Complaint, plaintiff asserts that she was "discriminated against due to the fact that she was a woman who was attracted to and/or sought relationships with other women, and/or a woman who did not conform to [] traditional gender stereotypes."  (Id. ¶ 13.)  In her opposition to this motion, plaintiff elaborates only that

she "believed that her complaints incorporated the belief that she was being discriminated against because of her sexual orientation and her gender in that she did not confirm [sic] to the normal traits that a female would."  (Pl.'s Mem. L. Opp. at 9–10.)

As noted above, Title VII prohibits employment discrimination because of an individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a).  To succeed, plaintiff must show that she suffered discrimination on the basis of protected status that resulted in an "adverse employment action."  See Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007).  A plaintiff may style a Title VII claim of sex discrimination by "alleging harassment or disparate treatment based upon nonconformity with sexual stereotypes."  Simonton v. Runyan, 232 F.3d 33, 38 (2d Cir. 2000) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989)); Dawson, 398 F.3d at 217–18.  A claim sounding in sex or gender stereotyping alleges discrimination where the plaintiff failed to "conform to gender norms."  Price Waterhouse, 490 U.S. at 251–52.  However, a plaintiff may not use a gender stereotyping claim to "bootstrap protection for sexual orientation into Title VII."  Dawson, 398 F.3d at 218 (quoting Simonton, 232 F.3d at 38).  Rather, a plaintiff must present facts supporting a cognizable Title VII sexual discrimination claim.  Id. at 221–23 (affirming dismissal of Title VII claim where plaintiff both "was not told" by employer that she needed to act more "feminine" and was not restricted to work assignments to only those "considered 'appropriate' for a woman to perform").

a.  Disparate Treatment

Plaintiff complains that she was "subjected to adverse employment actions" and a hostile work environment.  (Compl. ¶ 48.)  Under the burden-shifting framework of McDonnell Douglas, plaintiff first has the burden of establishing by a preponderance of the evidence a prima facie case of discrimination.  To do so, plaintiff must show (1) she was a member of a protected

class; (2) she was qualified for the position she held; (3) she experienced an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination.  See Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009). Should plaintiff sustain her burden, the burden shifts to EmblemHealth to articulate a legitimate, nondiscriminatory basis for its actions.  Burdine, 450 U.S. at 252–53.  Assuming EmblemHealth can do so, the burden shifts back to the plaintiff to prove that the reasons proffered by EmblemHealth were merely pretextual.  See id.

EmblemHealth does not dispute that plaintiff satisfies the first two elements of her required prima facie showing, but maintains that she did not suffer adverse employment actions under circumstances giving rise to an inference of discrimination.  (Def.'s Mem. L. at 9.)  To be actionable under Title VII, an adverse employment action must cause a "materially adverse change in the terms and conditions of employment" as opposed to "a mere inconvenience." Patane, 508 F.3d 112 (internal quotations omitted).  "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  Feingold, 366 F.3d at 152 (internal quotations omitted).

In her Complaint and also in her opposition to defendant's motion, plaintiff does not appear to contend that her October 2008 termination was motivated by discriminatory animus on the basis of her sexual orientation or gender.  (Compl. ¶ 44.)  Plaintiff does assert the following as adverse employment actions: (1) Dr. Liotta's request to Dr. Hanson that plaintiff be terminated; (2) Dr. Liotta's exclusion of plaintiff from meetings involving EmblemHealth's switch to the LandaCorp system; (3) plaintiff's lack of invitation to Dr. Platt's retirement party;

(4) plaintiff's 2005 performance evaluation wherein she was evaluated merely as "above average;" (5) Dr. Liotta's withdrawal of plaintiff's access to the E-Time system; and (6) various stares, leers, and sarcastic remarks made by Dr. Liotta and Dr. Cukierman. (Compl. ¶¶ 10, 12, 13, 15–19, 36); Pl.'s Mem. L. Opp. at 10.)[5]

Plaintiff has failed to carry her burden to show that she suffered a material adverse employment action on the basis of her sex or gender.  "To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Galayba v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotations and citations omitted).  None of the adverse employment actions plaintiff alleges with respect to Dr. Liotta, Dr. Platt, or Dr. Cukierman resulted in demotion, termination, loss of salary or benefits, or a material change in job responsibilities.  See Feingold, 366 F.3d at 152.  Regarding Dr. Liotta's conversation with Dr. Hanson, plaintiff offers no evidence that Dr. Liotta had any supervisory authority over plaintiff, Dr. Hanson, or Gail Nachbaur during the relevant time period.  (Pl.'s 56.1 Resp. ¶ 5; Nachbaur Dep. at 34, 40.) Accepted as true, plaintiff's allegations concerning the non-renewal of her user license to the E-Time System, lack of invitation to a retirement party and various staff meetings, and assorted leers or stares "simply do not rise to the level of actionable adverse employment actions." Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001), aff'd, 51 Fed. Appx. 55 (2d Cir. 2002) (granting summary judgment where plaintiff was excluded from certain meetings and from employer's performance evaluation process).[6]

---

[5] Plaintiff asserts that the termination "was motivated, at least in part, by Defendants' intent to retaliate against her for her repeated complaints."  (Compl. ¶ 44.)  Indeed, plaintiff begins her opposition to this motion by proclaiming that she brought suit "to address claims of retaliation due to [plaintiff's] engaging in protected activities, in violation of Title VII," without mentioning any other theory.  (Pl.'s Mem. L. Opp. at 1.)  Her retaliation claim will be addressed separately.

[6] Plaintiff also admitted in her deposition as to having "no idea" why her E-Time access was terminated or who terminated it to begin with.  (Pl.'s Dep. at 138, 141.)

Moreover, there is no dispute that from 2003—after defendant became aware of plaintiff's sexual orientation and relationship with Coyne—plaintiff received at least one promotion, five salary increases, and yearly performance reviews ranging from "Above Average" to Outstanding."  (Schmidt Decl. Exs. 7, 13, 14; Pl.'s Dep. at 82, 169–80.)  Although plaintiff contends that her 2005 performance evaluation wherein she only received an "Above Average" review—accompanied by a 5% raise—constitutes unlawful discrimination, even negative evaluations without accompanying adverse results are not sufficient to constitute adverse employment actions.  See Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999), aff'd, 205 F.3d 1327 (2d Cir. 2000).  Furthermore, plaintiff does not dispute that she subsequently received the highest possible evaluations in her 2006 and 2007 evaluations, accompanied by raises of 5% and 7%.  (Pl.'s Dep. at 221–22; Schmidt Decl. Exs. 13, 14.)

If this Court were to generously construe plaintiff's Complaint and submissions as alleging that her October 2008 termination also constituted adverse action based upon gender or gender stereotyping, EmblemHealth has sufficiently proffered "a legitimate, nondiscriminatory business rationale for" the termination.  Feingold, 363 F.3d at 152 (citing McDonnell Douglas, 411 U.S. at 802).  Defendant's burden here is "one of production, not persuasion," and involves "no credibility assessment" by the Court.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (internal quotations omitted).  EmblemHealth has proffered uncontroverted evidence that plaintiff's position was eliminated as part of a company-wide reduction in force ("RIF") that affected as many as 60 employees.  (Storniolo Decl. ¶¶ 1, 2, 4–5; Schmidt Decl. Ex. 18.)  EmblemHealth also supplied extensive documentation of a non-discriminatory basis for eliminating plaintiff's position, such as: the elimination of 26 positions in plaintiff's Case Management department, reducing her duties as supervisor; the return of the "Home Care

function" from Case Management to the department where it formerly resided; EmblemHealth's migration to the new LandaCorp data system; and the new requirement that all managers in Case Management be certified as clinicians, which plaintiff was not.  (Id. ¶¶ 7–10; Pl.'s 56.1 Resp. ¶ 2.)  Lastly, plaintiff does not dispute that since the 2008 RIF, her former position in Case Management has not been filled.  (Pl.'s 56.1 Resp. ¶ 58.)

As the defendant has carried its burden of showing a legitimate, nondiscriminatory rationale for eliminating plaintiff's position, the burden thus shifts back to plaintiff to show that such rationale was a mere pretext for discrimination.  Burdine, 450 U.S. at 252–53.  To do so, plaintiff must present "admissible evidence [of] circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  Feingold, 363 F.3d at 152.  This burden on plaintiff is higher than that required to establish a prima facie case of discrimination; a plaintiff's "initially vague allegation of discrimination" must be "increasingly sharpened and focused" at the third stage of the McDonnell Douglas framework.  Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985) (affirming summary judgment in favor of defendant).  To meet her burden, plaintiff must show "*both* that the [defendants'] reason was false, *and* that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original).  "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).

Plaintiff has failed to offer admissible evidence that would permit a reasonable juror to find that defendant's reason for terminating her was mere pretext for discrimination based on gender or gender stereotyping.  Plaintiff testified in her deposition that she has "no

personal knowledge" as to who made the decision to terminate her, when such decision was made, or whether Dr. Liotta was actually involved in the RIF whatsoever. (Pl.'s Dep. at 58–59; Pl.'s 56.1 Resp ¶ 53.)[7] Plaintiff also was informed her termination was encompassed within an RIF and admitted in her deposition to not asking why her position was included or whether other positions were also being eliminated. (Id. at 57; Pl.'s 56.1 Resp. ¶ 52.) Lastly, there remains no dispute that Coyne, plaintiff's domestic partner since before the events at issue, was and remains employed by EmblemHealth. (Id. at 62–63.)

Viewing the record as a whole and drawing all reasonable inferences in favor of the plaintiff, this Court concludes that no reasonable jury could find that the legitimate reasons offered by EmblemHealth for terminating plaintiff were a pretext for discrimination based on gender or gender stereotypes. Despite having a full opportunity to conduct factual discovery, plaintiff's submissions consist only of her own "vague allegations" of discrimination insufficient to meet her burden under step three of the McDonnell Douglas framework. See Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985). Defendant is therefore entitled to summary judgment on plaintiff's disparate treatment claim.

   b.   Hostile Work Environment

Plaintiff also alleges she suffered from a hostile work environment. (Compl. ¶ 48.) A defendant may be liable under Title VII for creating a hostile work environment if "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

---

[7] Plaintiff admitted in her deposition as to having no personal knowledge of Dr. Liotta's role in the October 2008. In her Rule 56.1 Counter Statement of Material Facts (Docket # 22), plaintiff states that she "disputes paragraph '53,' and adds that Liotta was pushing for Jantz to be included in the RIF." (Pl.'s 56.1 Resp. ¶ 53.) However, this assertion does not raise a triable issue of material fact because plaintiff fails to point to any admissible evidence to support her contention. "Plaintiff's beliefs cannot replace the admissible evidence required to permit an inference of discrimination and survive summary judgment." Waters v. Gen. Bd. of Global Ministries, 769 F. Supp. 2d 545, 555 (S.D.N.Y. 2011) (Buchwald, J.).

working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations

and quotations omitted).  "Conduct that is not severe or pervasive enough to create an objectively

hostile or abusive work environment—an environment that a reasonable person would find

hostile or abusive—is beyond Title VII's purview."  Id.; accord Thomas v. iStar Financial, Inc.,

629 F.3d 276, 281 (2d Cir. 2010) (holding that no reasonable jury could find a hostile

environment based on "occasional and isolated" events).  The conduct must be both objectively

hostile and subjectively perceived as such by a plaintiff.  Alfano v. Costello, 294 F.3d 365, 374

(2d Cir. 2002).  Whether conduct is sufficiently severe or pervasive depends on the "totality of

the circumstances," including the "frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."  Patterson v. Cnty. of Oneida,

N.Y., 375 F.3d 206, 227 (2d Cir. 2004) (internal quotations omitted).

        Plaintiff must also produce evidence demonstrating "that a specific basis exists

for imputing the conduct that created the hostile environment to the employer."  Rojas v. Roman

Catholic Diocese of Rochester, 660 F.3d 98, 106–07 (2d Cir. 2011) (internal quotations omitted).

"When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the

plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or

knew of the harassment but did nothing about it."  Perry v. Ethan Allen, Inc., 115 F.3d 143, 149

(2d Cir. 1997) (internal quotations omitted).

        Here, the record does not set forth evidence from which a reasonable jury could

conclude that the plaintiff suffered from a hostile work environment.  Plaintiff contends that

beginning in 2003, Dr. Liotta and Dr. Cukierman subjected her to a hostile work environment by

(1) asking Dr. Hanson to terminate plaintiff in a conversation sometime between 2003 and 2005;

(2) leering and making sarcastic comments while walking past plaintiff's office; and (3) creating "false issues with plaintiff's performance . . . in an attempt to subject [her] to discpline and/or termination."  (Compl. ¶ 12, 18, 19; Pl.'s Dep. at 44–45, 50–52, 98–99.)

Viewed in the totality of the circumstances, these allegations are neither sufficiently pervasive nor severe to permit a reasonable juror to conclude that plaintiff was subjected to a hostile work environment.  Incidents supporting a hostile work environment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); see also Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (holding that there "must be a steady barrage of opprobrious" comments to support a hosile work environment (internal citations and quotations omitted)).  Plaintiff's allegations against EmblemHealth do not establish that her workplace was "permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive [to create] an abusive working environment."  See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d Cir. 2010); see, e.g., Concey v. N.Y. State Unified Ct. Sys., 2011 WL 4549386 (S.D.N.Y. Sept. 30, 2011) (granting summary judgment on Title VII hostile work environment claim based on four alleged incidents over four-year period); St. Jean v. United Parcel Serv. Gen. Serv. Co., 2012 WL 71843 (E.D.N.Y. Jan. 10, 2012) (granting judgment on Title VII hostile work environment claim based on multiple incidents of "abusive comments, managerial discipline and close supervision" over five-year period)

Moreover, plaintiff has failed to adduce factual evidence aside from her own opinions expressed at deposition as to how these isolated events, even if true, were because of her membership in a protected class.  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 241

(2d Cir. 2007) (quotations omitted).[8]  Nor has plaintiff offered evidence that EmblemHealth subjected other female employees to pervasive treatment or abuse not suffered by similarly situated male employees or female employees who did conform to gender stereotypes.  As such, plaintiff's mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  Kulak v. City of N. Y., 88 F.3d 63, 71 (2d Cir. 1996) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

Moreover, plaintiff has failed to proffer evidence supporting a specific basis for imputing any of Dr. Liotta or Dr. Cukierman's allegedly offensive conduct to EmblemHealth. See, e.g., Rojas, 660 F.3d at 106–07.  There is no genuine dispute that neither Dr. Liotta nor Dr. Cukierman exercised supervisory authority over plaintiff or her direct supervisors, Dr. Hanson and Gail Nachbaur, during the events at issue.  (Hanson Dep. at 29–30; Pl.'s Dep. at 26–27; Pl.'s 56.1 Resp. ¶ 5; Nachbaur Dep. at 34, 40.)  Moreover, plaintiff cannot show that EmblemHealth provided "no reasonable avenue" to entertain plaintiff's complaints, as the record contains five complaints plaintiff filed between 2005 and 2006, prompting an internal investigation and responsive correspondence from EmblemHealth's HR and legal departments.  (Ricotta Decl. Exs. 3–9; Pl.'s Dep. at 126–28, 155.)

For the reasons set forth above, plaintiff has failed to raise a triable issue of fact with respect to her claim of a hostile work environment.  EmblemHealth is therefore entitled to summary judgment.

III.    Summary Judgment Is Granted as to Plaintiff's Claim of Retaliation

Plaintiff also brings a retaliation claim against EmblemHealth.  Title VII "makes it unlawful for an employer to discriminate against an employee for opposing any practice made

---

[8] With regard to Dr. Liotta, plaintiff went so far as to admit in her deposition that she "d[id]n't know what his reasons were for beginning his harassment."  (Pl.'s Dep. at 76.)

unlawful by Title VII." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011).  The anti-relation provision prohibits an employer from taking "materially adverse" action against an employee who "opposes conduct that Title VII forbids or the employee otherwise engaged in protected activity."  Id. (citing Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56–59 (2006)).

Title VII retaliation claims follow a modified version of the three-part burden-shifting analysis under McDonnell Douglas.  See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010).  Plaintiff must first establish a prima facie case of retaliation by showing: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  Id. (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).  In ruling on a motion for summary judgment, this Court's only role "is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  Id. (internal quotations omitted).  If plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to proffer a legitimate, nonretaliatory explanation for the activity, at which point the burden shifts back to the plaintiff to come forward with evidence that the justification is pretextual.  See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768–69 (2d Cir. 1998), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

To constitute protected activity, the employer must have "understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at *conduct prohibited by Title VII*."  Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) (emphasis in original) (internal quotations omitted).  The complained-of practices "need not have

actually amounted to a violation of Title VII" provided the plaintiff possessed a "good faith, reasonable belief" that her employer had violated the law.  McMenemy v. City of Rochester, 241 F.3d 279, 283 (2d Cir. 2001).

Plaintiff must also show an adverse employment action, referring to conduct that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205–07 (2d Cir. 2006) (quoting Burlington Northern , 548 U.S. at 57).  The test is objective, and intends to "separate significant from trivial harms" in requiring materiality.  Burlington Northern, 548 U.S. at 68.  Acts of retaliation are "considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross to be actionable."  Hicks, 593 F.3d at 165.  Although anti-retaliation protection is broader than anti-discrimination protection, Title VII "does not set forth a general civility code for the American workplace."  Burlington Northern, 548 U.S. at 68 (internal quotations omitted).

To complete her prima facie case, plaintiff must establish a causal connection between her protected activity and an adverse employment action.  "In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action."  Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) (internal quotations omitted).  Although there exists no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," id., a court must consider the context of the particular case in "exercising judgment and drawing permissible inferences."  Isaac v. City of N.Y., 701 F. Supp. 2d 477, 493 (S.D.N.Y. 2010).

In her opposition to EmblemHealth's motion for summary judgment, plaintiff alleges the following retaliatory acts: (1) Dr. Liotta's decision to withdraw plaintiff's access to E-Time; (2) exclusion from certain meetings; (3) lack of invitation to Dr. Platt's retirement party; (4) her 2005 performance review wherein she received only an "Above Average" evaluation; (5) assorted leers, stares, and sarcastic comments made by Dr. Liotta and Cukierman; (6) Dr. Liotta's conversation with Dr. Hanson in 2004 or 2005 wherein he sought to have plaintiff terminated; and (7) plaintiff's October 2008 termination.  (Pl.'s Mem. L. Opp. at 4–6, 10.)  This Court assumes arguendo that plaintiff engaged in protected activity by writing a series of complaints under a good faith belief that she had been subjected to unlawful discrimination and that EmblemHealth was aware of plaintiff's protected activity.[9]

    a.   Pre-Termination Acts of Retaliation

Accepting the facts as true and drawing all reasonable inferences in her favor, plaintiff has failed to create a genuine issue of material fact that she suffered an adverse employment action prior to termination.  Exclusion from meetings, lack of an invitation to a co-worker's retirement party, and leers, stares, and sarcastic remarks do not, as a matter of law, rise beyond the level of "trivial harms" or "minor annoyances that often take place at work and that all employees experience."  Tepperwien v. Entergy Nuclear Ops., Inc., 663 F.3d 556, 568 (2d Cir. 2011) (quoting Burlington Northern, 548 U.S. at 68).  Indeed, "[n]egative or otherwise insulting statements are hardly even actions, let alone 'adverse actions.'"  Id. at 571 (holding that comments, stares, and threats of termination do not—even in the aggregate—constitute adverse employment action); Bickerstaff v. Vassar Coll., 354 F. Supp. 2d 276, 281, aff'd, 160 Fed. Appx.

---

[9] Defendant asserts that plaintiff failed to engage in protected activity because the complaints she submitted only allege discrimination on the basis of her sexual orientation.  (Def.'s Mem. L. at 8–9.)  However, plaintiff need only a reasonable, good faith belief that that she suffered from unlawful discrimination; the practices identified need not actually amount to a Title VII violation.  See McMenemy, 241 F.3d at 283.

61 (2d Cir. 2005) ("Exclusion from meetings or social functions do not constitute adverse actions either.").

Accepting as true that Dr. Liotta did in fact approach Dr. Hanson at some point in 2004 or 2005 to request plaintiff's termination, plaintiff has offered no evidence to dispute that (1) Dr. Liotta had no supervisory authority over her or Dr. Hanson, (2) Dr. Liotta had no role in preparing any of plaintiff's performance evaluations or salary increases, (3) Dr. Hanson's supervision of plaintiff was not impacted by his comments, and (4) plaintiff received a promotion and multiple salary increases during the years when the conversation allegedly occurred.  (Pl.'s 56.1 Resp. ¶¶ 5, 8, 9, 15, 16, 21, 24.)  "Courts interpreting Burlington Northern have held that empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions."  Tepperwien, 663 F.3d at 571 (internal quotations omitted).

Nor do plaintiff's 2005 evaluation—assigning her a 5% raise and a grade of "Above Average"—or the non-renewal of her E-Time user license constitute material adverse employment actions.  Neither action rises to the level of termination, demotion, decrease in salary or wages, loss of title, or significantly diminished material responsibilities.  Sanders v. N.Y. City Human Res. Admin, 361 F.3d 749, 755 (2d Cir. 2004).  Plaintiff's 2005 review was neither negative nor did it accompany a loss of benefits, salary, or job responsibilities.  Indeed, the evidence shows that plaintiff received a 5% salary increase and successive raises in 2006 and 2007.  (Pl.'s 56.1 Resp. ¶¶ 28–29, 32.)  Regarding her access to the E-Time system, not only has plaintiff not offered any admissible evidence to refute Storniolo's testimony that EmblemHealth reduced the number of company-wide E-Time licenses from thirty to three in centralizing access in a different department (Storniolo Dep. at 20–22), she has cited no authority suggesting that

25

removal of access to such a system constitutes a material adverse employment action.  See, e.g., Wanamaker v. Columbian Rope, Co., 108 F.3d 462, 466 (2d Cir. 1997) (holding that removal of plaintiff's office and telephone access, "standing alone, has never been held adverse action" under Title VII or the ADEA).

Even when viewed in the aggregate, no reasonable fact-finder could conclude that these pre-termination activities amounted to adverse employment action.  As a preliminary matter, individual actions that "were trivial . . . remain trivial" even when analyzed collectively. Tepperwien, 663 F.3d at 572.  Plaintiff has failed to raise a genuine issue of material fact that these actions, even in the aggregate, adversely affected her "in any material way."  Id.  "Zero plus zero is zero."  Id. (quoting MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 138 F.3d 33, 38 (2d Cir. 1998)).

The test for adverse employment action is whether a reasonable employee would have been deterred from engaging in protected activities.  See Kessler, 461 F.3d at 205–07.  The Second Circuit has instructed that while the test is an objective, it remains relevant whether the plaintiff himself was deterred from complaining.  Tepperwien, 663 F.3d at 572.  Here, the record contains five complaints submitted by plaintiff following the commencement of the alleged retaliatory acts.  (Ricotta Decl. Exs. 4, 5, 6, 7, 9.)  Nowhere in her initial Complaint nor in her opposition to EmblemHealth's present motion does plaintiff contend that she or similarly situated employees were dissuaded from complaining about discriminatory conduct.  And following plaintiff's last written complaint—dated July 28, 2006 (id. Ex. 9)—plaintiff continued to work for defendant for an additional two years, receiving two additional salary increases and "Outstanding" performance evaluations.  (Pl.'s 56.1 Resp. ¶¶ 28, 32.)

"[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable.'" Tepperwien, 663 F.3d at 571 (quoting Burlington Northern, 548 U.S. at 68) (affirming judgment as a matter of law dismissing plaintiff's retaliation claim where alleged retaliatory acts included threats of termination, exclusion from meetings, disciplinary counseling, and comments and stares from co-workers). Accepting the facts as true and drawing all reasonable inferences in plaintiff's favor, plaintiff has failed to raise a genuine issue of material fact that the alleged retaliatory acts by defendant amounted to adverse employment action.

> b.   October 2008 Termination

Plaintiff contends that her October 2008 termination from EmblemHealth was retaliatory. (Pl.'s Mem. L. Opp. at 10.)  The Court assumes arguendo that plaintiff has established a prima facie case of retaliation in alleging that she was terminated approximately two years following her July 28, 2006 complaint of discrimination to EmblemHealth.  Under the modified McDonnell Douglas three-part framework, the burden thus shifts to EmblemHealth to proffer a legitimate, nonretaliatory explanation for terminating plaintiff. See Quinn, 159 F.3d at 768–69.

EmblemHealth has met its burden.  Storniolo, the Director of Healthcare Operations, testified under oath that plaintiff's termination was eliminated as part of a company-wide RIF that included up to 59 other employees. (Storniolo Decl. ¶¶ 2, 4, 5, 8, 9.) EmblemHealth also supplied extensive documentation of its reasons for eliminating plaintiff's position, such as: the downsizing of plaintiff's Case Management department, reducing the need for supervision by a director; the return of the "Home Care function" from Case Management to the department where it formerly resided; and the company-wide transition to the new

LandaCorp data system. (Schmidt Decl. Ex. 18; Storniolo Decl. ¶¶ 7–10.)  Plaintiff was informed

in her December 2007 evaluation that EmblemHealth was "working on combining" its data

systems and that the amount of work for Case Management would be "greatly reduce[d]."

(Schmidt Decl. Ex. 14)  Her then-supervisor, Gail Nachbaur, further testified that the 2008 RIF

rendered plaintiff's position non-essential.  (Nachbaur Dep. at 20.)

        EmblemHealth has met its burden of producing a legitimate, non-retaliatory

reason for plaintiff's termination.  As a result, plaintiff is obliged to come forward with

admissible evidence that her termination was related to her protected activity and not

EmblemHealth's proffered rationale.  See, e.g., Rojas v. Roman Catholic Diocese of Rochester,

783 F. Supp. 2d 381, 413 (W.D.N.Y. 2010), aff'd, 660 F.3d 98 (2d Cir. 2011) (granting summary

judgment to employer where even assuming employer's reason for termination was false,

plaintiff failed to come forward with evidence that termination was causally linked to protected

activity).  Plaintiff has failed to do so.  Plaintiff admitted in her deposition that she has "no

personal knowledge" as to who made the decision to terminate her or when such decision was

made.  (Pl.'s Dep. at 58–59.)  Plaintiff also admitted in her deposition to not asking why her

position being eliminated or whether other positions were also being eliminated.  (Id. at 57; Pl.'s

56.1 Resp. ¶ 52.) [10]  Plaintiff had also received a salary increase to $94,525 in July 2008, as well

as a paid leave of absence and permission to work a reduced workload.  (Schmidt Decl. Ex. 15;

Pl.'s Dep. at 252, 259–64.)  Moreover, plaintiff agrees that since the 2008 RIF, her position in

Case Management has never been filled.  (Pl.'s 56.1 Resp. ¶ 58.)  Lastly, there remains no

dispute that Coyne, plaintiff's domestic partner since before the events at issue, was and remains

employed by EmblemHealth.  (Pl.'s Dep. at 62–63.)

---

[10] In her Counter Statement of Material Facts pursuant to Local Rule 56.1, plaintiff states: "Plaintiff has no idea (and, therefore, cannot refute) how many others were included in the October 2008 RIF."  (Id. ¶ 54.)

For the foregoing reasons, EmblemHealth is entitled to summary judgment as to plaintiff's claim of retaliation.

<u>CONCLUSION</u>

For the reasons set forth above, defendant's motion for summary judgment is GRANTED.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
February 6, 2012